UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **SAMANTHA PAUS**, on behalf of herself and all others similarly situated, <br><br>      Plaintiff, <br><br> v. <br><br> **GOOSEHEAD INSURANCE AGENCY LLC**, <br><br>      Defendant. | Case No.: 4:25-cv-01161 <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

1.      Plaintiff, Samantha Paus ("Plaintiff"), on behalf of herself and all others similarly situated, states as follows for her class action complaint against Defendant, Goosehead Insurance Agency LLC ("Goosehead" or "Defendant"):

2.      Between March 6, 2025, and March 13, 2025, Goosehead lost control over its computer network and the highly sensitive personal information stored therein was stolen in a data breach perpetrated by cybercriminals (the "Data Breach"). Upon information and belief, the Data Breach has impacted thousands of current and former customers and employees.

3.       Following an internal investigation, Defendant learned that the cybercriminals had gained unauthorized access to customers' and employees' personally identifiable information ("PII"), including but not limited to their names, Social Security numbers, driver's license numbers and/or state identification numbers, and financial account information.

4.      On or about October 10, 2025, *seven* (7) months later, Goosehead finally began notifying Class Members and various government entities about the Data Breach ("Breach Notice").

1

5.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

6.      Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell victims how many people were impacted, how the breach happened, when it was discovered, or why Defendant delayed notifying victims that cybercriminals had gained access to their highly private information.

7.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

9.      In failing to adequately protect its customers' and employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former customers and employees.

10.     Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.     Plaintiff is a former customer and a Data Breach victim.

12.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

13.     Plaintiff Samantha Paus is a natural person and citizen of Warrenville, Illinois, where she intends to remain.

14.     Defendant, Goosehead Insurance Agency, LLC, is a Delaware limited liability company with its principal place of business at 1500 Solana Blvd, Building 4, Ste. 4500, Westlake, Texas. The registered agent for service of process is Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 7th Street, Suite 620, Austin, TX 78701.

## JURISDICTION & VENUE

15.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom, including Plaintiff, have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant is a citizen of Texas.

16.     This Court has personal jurisdiction over Defendant because it operates in this District, has its principal place of business in the Fort Worth Division of the Northern District of Texas and conducts substantial business in this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant maintains substantial operations in the Fort Worth Division of the Northern District of Texas, Defendant has its principal place of business in this District, and Defendant has harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

*Goosehead Insurance, LLC*

18.     Goosehead states it is a "rapidly growing and innovative independent personal lines insurance agency that distributes products and services throughout the United States."[1] Goosehead represents over 150 insurance companies that underwrite personal and commercial lines[2] and holds approximately 1,674,000 policies.[3]

19.     Goosehead reports it earned $93.9 million in revenue in the fourth quarter of 2024.[4]

20.     On information and belief, Goosehead accumulates highly private PII of its current and former customers and employees.

21.     In collecting and maintaining its customers' and employees' PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. Plaintiff and Class Members themselves took reasonable steps to secure their PII.

22.     Goosehead understood the need to protect its current and former customers' and employees' PII and prioritize its data security.

23.     Indeed, Goosehead promises in its privacy policy that "[w]e have implemented reasonable and appropriate measures designed to secure your personal information from accidental loss and from unauthorized access, use, alteration, and disclosure."[5]

24.     Despite recognizing its duty to do so, on information and belief, Goosehead has not implemented reasonably cybersecurity safeguards or policies to protect customers' and

---

[1] *Goosehead Insurance Acquires More than 15,000 Insurance Policies Through Agreement with Vivint Smart Home*, GOOSEHEAD (May 11, 2023), https://ir.gooseheadinsurance.com/news-releases/news-release-details/goosehead-insurance-acquires-more-15000-insurance-policies .
[2] *Id*.
[3] *Goosehead Insurance, Inc. Announces Fourth Quarter and Full Year 2024 Results*, GOOSEHEAD (Feb. 24, 2025), https://ir.gooseheadinsurance.com/news-releases/news-release-details/goosehead-insurance-inc-announces-fourth-quarter-and-full-year-4.
[4] *Id*.
[5] *Privacy Policy*, GOOSEHEAD (Feb. 24, 2025), https://www.goosehead.com/privacy-policy/?t=w#the_scope_of.

employees' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to customers' and employees' PII.

***Goosehead Failed to Safeguard Employees' PII***

25.     Plaintiff is a customer of Goosehead and a data breach victim.

26.     As a condition of receiving services from Goosehead, Plaintiff provided Defendant with her PII. Defendant used that PII to facilitate its business.

27.     On information and belief, Goosehead collects and maintains its customers' and employees' unencrypted PII in its computer systems.

28.     In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

29.     On or aorund March 13, 2025, an unauthorized actor accessed Defendant Goosehead's network.

30.     Defendant's cyber and data security systems were completely inadequate in that it allowed cybercriminals to obtain and steal files containing a treasure trove of thousands of its customers' and employees' highly sensitive PII.

31.     Defendant reported to the Attorney General of Texas that the Data Breach affected 17,379 citizens of Texas alone.[6]

32.     Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft and sale on the Dark Web.

33.     Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing customers' and employees' PII, as evidenced by the Data Breach.

---

[6] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Oct. 16, 2025).

34.     On or around October 10, 2025— a staggering seven (7) months after the Breach first took place—Defendant finally notified Class Members about the Data Breach.

35.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

36.     Defendant failed in its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII stored in its systems. And thus, Defendant caused widespread injury and monetary damages.

37.     Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

38.     As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."

39.     Worryingly, the notorious "Chaos" ransomware gang claimed responsibility for the cyberattack.[7]

40.     According to FalconFeeds, a cybersecurity firm that tracks Dark Web activity,[8] on March 31, 2025, Choas created a post on its Dark Web portal stating that it had hacked Defendant.[9]



---

[7] #CHAOS Ransomware Alert, FalconFeeds (@FalconFeeds.io), X (Mar. 31, 2025, 3:05 PM), https://x.com/FalconFeedsio/status/1906800099499622837.

[8] See Home Page, FALCONFEEDS, https://falconfeeds.io/ (last visited Oct. 16, 2025).

[9] See n. 12.

41.    Chaos's post contained a description of Defendant's business, the words "Leaked size 300 Gb" and "View count" 3240.[10] This indicates that Chaos stole 350 gigabytes of data from Defendant and, as of the first day of the March 31, 2025, post, the post had been viewed 3240 times.

42.    Chaos operates a "ransomware-as-a-service business" where cybercriminal customers can pay to use Chaos's ransomware software to launch attacks and collect ransoms.

43.    According to Cisco Talos, Cisco's threat intelligence research organization,[11] Chaos is relatively new RaaS group that emerged as early as February 2025.[12] The Chaos group is actively promoting their cross-platform ransomware software in the Dark Web Russian-speaking cybercriminal forum Ransom Anon Market Place (RAMP) and is seeking collaboration with affiliates.

44.    Chaos is known to use various methods, such as spam flooding and social engineering, to gain access to organizations' network.[13]

45.    Once inside, it targets PII and uses "rapid selective encryption" to encrypt files and then employes legitimate file-sharing software for data exfiltration.[14]

46.    Chaos then demands a ransom payment, threatening to disclose the stolen data of organizations who fail to meet their ransom demands on a "data leak site" it operates.[15]

47.    Defendant has not made any public statements about Chaos or whether it paid a ransom demand.

---

[10] The screen shot of Chaos' Dark Web post was obtained from RansomLook, an open-source project aimed at assisting users in tracking ransomware-related posts and Dark Web activities. *See About*, RANSOMLOOK, https://www.ransomlook.io/about (last visited Oct. 16, 2025).

[11] *See Home Page*, CISCO TALOS, https://talosintelligence.com/ (last visited Oct. 16, 2025).

[12] Anna Bennett, James Nutland, and Chetan Raghuprasad, *Unmasking the new Chaos RaaS group attacks*, CISCO TALOS (July 24, 2024), https://blog.talosintelligence.com/new-chaos-ransomware/.

[13] *Id.*

[14] *Id.*

[15] *Id.*

48.     However, even if Defendant made a ransom payment, there is no guarantee that the PII stolen in the Data Breach will be deleted.[16]  The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[17]

49.     Thus, on information and belief, Chaos has already leaked the stolen PII of thousands of Defendant's current and former customers and employees on the Dark Web.

50.     Defendant, who boasts of its "unwavering dedication to advanced technology"[18] knew or should have known of the tactics that groups like Chaos employ.

51.     Goosehead could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII. Instead, Goosehead failed to abide by its own Privacy Policy and other legal obligations.

52.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

53.     On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its customers' and employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

---

[16] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, The HIPAA Journal (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[17] *Id*.
[18] *Technology & Lead Generation*, GOOSEHEAD, https://www.goosehead.com/become-a-franchisee/tech-and-lead-gen/?t=w (last visited Oct. 16, 2025).

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.***

54.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

55.    Indeed, in 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[19]

56.    In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

57.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[20]

58.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

59.    In the years immediately preceding the Data Breach, Defendant knew or should

---

[19]  *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited Oct. 16, 2025).

[20]  Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Oct. 16, 2025).

have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

60.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on Dark Web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[21]

61.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[22]

62.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on Dark Web portals, and (iv) ransomware tactics included threatening to release stolen data.

63.    In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employes in an Internet-accessible environment, had reason to be on guard for the

---

[21] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[22] *Ransomware Guide*, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide  (last visited Oct. 16, 2025).

exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

64.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

65.    Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its customers' and employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience and Injuries***

66.    Plaintiff is a former customer of Defendant and a data breach victim.

67.    As a condition of receiving Defendant's services, Plaintiff provided Defendant with her PII, including her name and Social Security Number. Defendant used that PII to facilitate its business.

68.    Plaintiff provided her PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

69.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by Choas or by other cybercriminals on the Dark Web.

70.    Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the breach.

71.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff's PII for theft by cybercriminals and sale on the Dark Web.

72.    Plaintiff suffered actual injury from the exposure of her PII —which violates her

rights to privacy.

73.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. PII is a form of intangible property—property that Defendant was required to adequately protect.

74.    As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing her online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

75.    Plaintiff has already spent and will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of her Social Security number, will impact her ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

76.    Plaintiff is now subject to the present and imminent risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach in a timely fashion.

77.    Following the Breach, Plaintiff began receiving an influx of spam, scam, and phishing phone calls, text messages and emails. Plaintiff received very little of such communications prior to March 2025.

78.    Once an individual's PII is for sale and access on the Dark Web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[23] On information and belief, the spam, scam, and phishing calls and texts Plaintiff is experiencing is a result of the Data Breach.

79.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

80.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

81.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, uncompensated lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

    a.    The loss of the opportunity to control how their PII is used;

    b.    The diminution in value of their PII;

    c.    The compromise and continuing publication of their PII;

    d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent

---

[23] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of stolen PII; and

h.   The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

82.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

83.     The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "Dark Web" internet websites, making the information publicly available, for a substantial fee of course.

84.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

85.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

86.     One such example of criminals using PII for profit is the development of "Fullz" packages.

87.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data

available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

88.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

89.    Defendant disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

90.    Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

*Consumers Prioritize Data Security*

91.     In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[24] Therein, Cisco reported the following:

a.  "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[25]

b.  "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[26]

c.  89% of consumers stated that "I care about data privacy."[27]

d.  83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[28]

e.  51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[29]

f.  75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[30]

92.     Defendant knew or should have known that adequate implementation of cybersecurity and protection of PII, including Plaintiff and the Class's PII, was important to its

---

[24] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, Cɪsco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Oct. 16, 2025).
[25] *Id*. at 3.
[26] *Id*.
[27] *Id*. at 9.
[28] *Id*.
[29] *Id*.
[30] *Id*. at 11.

customers and employees.

***Defendant failed to adhere to FTC guidelines.***

93.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

94.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

    a.   protect the personal customer information that they keep;

    b.   properly dispose of personal information that is no longer needed;

    c.   encrypt information stored on computer networks;

    d.   understand their network's vulnerabilities; and

    e.   implement policies to correct security problems.

95.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

96.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

97.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' and employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

99.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

100.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

101.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

102.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

104.    Plaintiff sues on behalf of herself and the proposed Class ("Class"), defined as follows:

**All individuals residing in the United States whose PII was impacted in Defendant's Data Breach.**

105.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

106.    Plaintiff reserves the right to amend the class definition.

107.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements for suing as representative parties:

108.    **Numerosity**. Plaintiff is representative of the proposed Class, consisting of at least 17,379 members, far too many to join in a single action;

109.    **Ascertainability**. Class members are readily identifiable from information in Defendant's possession, custody, and control;

110.    **Typicality.** Plaintiff's claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

111. **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's interests. Her interests do not conflict with Class members' interests, and she has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

112. **Commonality.** Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

a. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing PII;

d. Whether Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. Whether Defendant's Breach Notice was reasonable;

g. Whether the Data Breach caused Plaintiff's and the Class's injuries;

h. What the proper damages measure is; and

i. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

113. Further, common questions of law and fact predominate over any individualized

questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

114.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

115.    Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

116.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

117.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

118.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. Defendant actively sought and obtained Plaintiff and Class Members' PII.

119.    Defendant owed—to Plaintiff and Class Members—at least the following duties to:

   a.  exercise reasonable care in handling and using the PII in its care and custody;

   b.  implement industry-standard security procedures sufficient to reasonably protect

the information from a data breach, theft, and unauthorized;

c.  promptly detect attempts at unauthorized access;

d.  notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

120.    Also, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

121.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

122.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

123.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

124.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

125. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

126. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

127. Defendant breached these duties as evidenced by the Data Breach.

128. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and Class Members' PII by:

    a. disclosing and providing access to this information to third parties and

    b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

129. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

130. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

131. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

132. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary

damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

133.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and uncompensated lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

134.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

135.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

136.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

137.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

138.    Defendant violated its duty under Section 5 of the FTC Act by failing to use

reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

139.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

140.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

141.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

142.    Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

143.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### COUNT III
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

144.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

145.    Defendant offered to employ or provide insurance services to Plaintiff and members

of the Class if Plaintiff and members of the Class provided Defendant with their PII.

146.    In turn, Defendant agreed it would not disclose the PII it collected to unauthorized persons. Defendant also promised to safeguard its customers' and employees' PII.

147.    Plaintiff and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for insurance services from Defendant or employment with Defendant.

148.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their PII.

149.    Plaintiff and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

150.    Defendant materially breached the contracts it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

    a.  Failing to properly safeguard and protect Plaintiff's and members of the Class's PII;

    b.  Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c.  Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

151.    The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

152.    Plaintiff and members of the Class have performed under the relevant agreements,

or such performance was waived by the conduct of Defendant.

153.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

154.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

155.    Defendant failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

156.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

157.    Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

158.    Plaintiff, on behalf of herself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## COUNT IV
### Unjust Enrichment
### (On Behalf of the Plaintiff and the Class)

159.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

160.    This claim is plead in the alternative to the breach of implied contractual duty claim.

161.    Plaintiff and members of the Class conferred a benefit upon Defendant in the form of payment for insurance services or in the form of services through employment. Defendant also benefited from the receipt of Plaintiff's and the Class's PII, as this was used to facilitate its business.

162.    Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class.

163.    Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the proposed Class's payments, services, and their PII because Defendant failed to adequately protect their PII. Plaintiff and the proposed Class would not have paid Defendant the amount they did, provided their PII to Defendant, or worked for Defendant at the payrates they did had they known Defendant would not adequately protect their PII.

164.    Defendant should be compelled to disgorge into a common fund to benefit Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**COUNT V**
**Invasion of Privacy**
**(On Behalf of the Plaintiff and the Class)**

165.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

166.    The State of Texas recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of

his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts§ 652B (1977)

167.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

168.    Defendant owed a duty to its customers and employees, including Plaintiff and the Class, to keep this information confidential.

169.    The unauthorized acquisition (*i.e.*, theft) by a third party of Plaintiff's and Class Members' PII is highly offensive to a reasonable person.

170.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant as part of their business relationship with Defendant or their employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

171.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

172.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

173.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

174.    Acting with knowledge, Defendant had notice and knew that its inadequate

cybersecurity practices would cause injury to Plaintiff and the Class.

175.    As a proximate result of Defendant's acts and omissions, the PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

176.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

177.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

178.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### COUNT VI
### Breach of Fiduciary Duty
### (On Behalf of the Plaintiff and the Class)

179.    Plaintiff incorporates all previous allegations contained in paragraph 1-113, as if fully set forth herein.

180.    Given the relationship between Defendant and Plaintiff and Class members, where Defendant served as their trusted insurance agent and became guardian of Plaintiff's and Class members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff's and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure;

and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

181.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

182.    Because of the highly sensitive nature of the PII, Plaintiff and Class members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

183.    Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

184.    Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

185.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

31

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E. Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands that this matter be tried before a jury.

Dated: October 17, 2025                          Respectfully Submitted,


_/s/ Joe Kendall_____
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000 / 214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

Jeff Ostrow (*pro hac vice* forthcoming*)*
**KOPELOWITZ OSTROW P.A.**

32

1 W Las Olas Blvd, Suite 500
Ft. Lauderdale, FL 33301
Tel.: (954) 525-4100
ostrow@kolawyers.com

***Attorneys for Plaintiff and Proposed Class***